McKinney, J.,
delivered the opinion of the Court.
This was an action of ejectment brought by Stuart against the tenant of the defendants, on the 6th of January, 1853, Verdict and judgment were for the plaintiff. The plaintiff claims under a grant from North Carolina to James Greenlee, dated 7th July, 1794. Defendants claim under a prior grant from North Carolina, to Michael Woods, dated 10th November, 1784. The younger grant of plaintiffs laps on the elder grant of defendants. The location of the two grants, with reference to each other, and the interference, will be seen from the annexed diagram.

*537

The proof shows that, perhaps more than thirty years before the present suit, Stuart cleared and enclosed a field (designated on the plat as the “McGinnis field”) which extended oyer what, he insists, is the true eastern boundary of the Woods grant, and taking a small part of the land covered by the latter grant; and has held a continuous adverse possession of said field during all *538 that period, claiming the entire angle, as represented on the plat, covered by both grants. And upon this point there is no conflict in the proof, except as regards the question, which of the three lines, represented on the plat as Nos. 1, 2, 3, is the proper eastern boundary of the Woods grant ?
If line No. 1 he the boundary, as Waddle insists, then the McGinnis field lies without the limits of the Woods grant, and Stuart’s possession of that field would he unavailing for any purpose in this suit. But, on the other hand, if either of the lines, Nos. 2 and 3, he the proper boundary, then Stuart’s possession of a part of the land covered by both grants would have the effect to give him title to the extent of his boundaries, under the first section of the act of 1819, both of said last-mentioned lines including part of the McGinnis field; and the defendants having had no actual possession within the limits of the interference until the year 1845 — prior to which time, Stuart had held an exclusive and adverse possession for a period of more than seven years.
Upon the point of boundary, it need only be remarked that the jury, on the trial, established line No. 3 as the true boundary of the Woods grant; and, upon the facts as presented in this record, we are not prepared to say that their conclusion was erroneous.
The proof further shows, that about the first of October, 1845, one James Wright, as the tenant of Waddle, erected a cabin, and cleared and made an enclosure around it, at the place designated on the plat “Wright’s house.” The cabin, as will be seen, is outside of the interference, but the enclosure was extended over the line, and embraced perhaps the fourth of an acre of the *539 ground covered by both titles; and this possession has been continued by the tenant, Wright, ever since; and had been held for more than seven years before the commencement of this action.
In respect to this possession of Wright’s, the questions are made: First, as to its character — whether adverse to Stuart or not; and, secondly, if adverse, its legal effect.
It is argued, on behalf of Stuart, that the extension of Wright’s enclosure over the line C E was accidental and unintentional on the part of Wright, in ignorance of where the line really was ; and therefore his possession was not adverse to Stuart. The contrary of this is asserted on behalf of Waddle.
Wright, the tenant, was examined as a witness, and no objection is urged to his competency. The substance of his testimony is, that Waddle showed him where to build his cabin, and at that time he made no inquiry, and knew nothing about the line of the Greenlee grant; but a week or two afterwards, and before making his enclosure, he asked Waddle about his line, and the latter described a ledge of rocks which witness found on line No. 1, near the Cave Spring, represented on the plat. Some time after this, S. D. Stuart, son of the plaintiff, pointed out to him the course of the line O E, and claimed it as his father’s line. Wright did not inform Waddle what Stuart had said about the line. The witness stated that he did not intend to place his fence over the line claimed by Stuart, and thought it was on the line until in 1849, when a controversy took place between Stuart and Waddle in regard to the fence: the former insisted on his moving the fence, and the latter *540 opposed it. Witness did not move it, and then concluded to hold the small piece of ground in dispute for Waddle, but had had no such intention previously, as he had supposed, up to that time, that the fence was on the line.
With reference to the question arising on the foregoing facts, namely, whether or not the possession was adverse to Stuart, the Court, in substance, instructed the jury that the intentions, declarations, and acts of the tenant were to he regarded as the intentions, declarations, and acts of his landlord, and were binding on him.
In the charge of the Court, the doctrine of accidental and unintentional enclosures, as between adjoining owners of land, is, we think, misapplied; and the relations between landlord and tenant misapjirehended.
If it be true, as is assumed with great force by the counsel for plaintiffs in error, that the obvious purpose and intention of Waddle in placing Wright in possession of the land at the point designated was to acquire, under his elder and supposed superior title, an actual adverse possession within the limits of the interference; and if, with this view, he pointed the tenant to a part of the land covered by both titles, with the design that the tenant should make an enclosure within the bounds of the interference, and thereby gain for him, Waddle, an actual adverse possession of part of the land in controversy; and if, upon an enclosure being so made over the line, he, Waddle, claimed the possession, thus acquired, for himself, and adversely to Stuart, it would, under the circumstances, in our opinion constitute an adverse possession in Waddle, notwithstanding the intention, words, or acts of Wright, the tenant.
*541 It matters not that the landlord did not disclose the object and purpose in his own mind to his tenant. This, for obvious reasons of policy, he may have declined to do, but the concealment does not, in the least degree, affect the legal character of the transaction. The possession, so acquired, was, in law, the landlord’s possession; and the character of such possession depended upon not the intention or acts of the tenant, but of the landlord. The tenant was merely the instrument of his landlord in gaining the possession; and if the latter intended to hold for himself, and actually did so hold, his possession would clearly be adverse, although the tenant may, all the while, have been ignorant of his landlord’s intention, as well as of the fact of his adverse claim. The legal effect is the same, in the case supposed, as if the landlord, in person, had been in possession, claiming and holding adversely. A tenant, until after a disclaimer of his relation, known to the landlord, cannot be allowed to entertain a purpose adverse to the latter; nor by his intentions, words, or acts, to defeat the intentions or prejudice the rights of his landlord. He cannot, until after he shall have thrown off his allegiance, place himself in an attitude either of positive hostility or mere neutrality, so as thereby to work a prejudice to his landlord’s possession. Hence, it follows that the fact of Wright’s ignorance that the enclosure was over the line, and the absence of any intention on his part to hold in opposition to Stuart, can have no influence upon the case.
We assume, therefore, upon the hypothesis stated, that the possession of the small piece of ground over the line of the Greenlee grant was adverse to Stuart; and this brings us to the other question, what was the effect of *542 such possession ? For the plaintiffs in error, it is assumed that Waddle’s entry and actual possession of that part of the land in controversy embraced in Wright’s enclosure had the effect to neutralize the possession of Stuart, and to arrest the operation of the statute of limitations ; and this state of facts having continued to exist for a period of more than seven years, from the time of Waddle’s entry, before the commencement of this suit, the question was now a mere question of title; and as the title of Waddle, under the Woods grant, was the elder and better title, the law regards the seisin and legal possession to he in him.
This reasoning is unsound. By the express terms of the first section of the act of 1819, Stuart, by virtue of his seven years’ possession of part of the land within the interference, prior to the possession taken by Waddle, acquired an “indefeasible title in fee simple” to all the land covered by his grant, lying within the boundaries of the Woods grant. His younger and previously inferior title thereby became not merely the better, but the only valid title to that part of the land covered by both grants. Consequently, when Waddle, by his tenant, took possession in 1845, (whether he be regarded as having entered without title or under an invalid title,) the principle applies, that the possession, in law, was in Stuart, who had the right. For although there may be a concurrent possession in fact, there cannot be a concurrent actual right of possession at the same time in adverse claimants. And therefore, in case of a mixed or concurrent possession, the legal seisin is in him who has the title. Hence, Stuart being, in law, the rightful owner of the land, by operation of the statute of limitations, the legal possession was in him of the whole *543 of the land covered by his grant; and this possession continued to he in him still, after the entry of Waddle’s tenant, except to the extent that he was disseised by the actual enclosure and occupation of the latter.
The effect of Waddle’s entry and possession, under the circumstances stated, was, at most, to defeat the title of Stuart, and regain a title to himself to so much of the land, within the enclosure of Wright, as had been enclosed for the space of seven years before the commencement of this action. •
In applying the doctrine of the case of West vs. Lanier, 9 Humph., 762, in favor of Stuart’s possession, and in other respects, the charge is subject to criticism. But as these matters are of no practical importance, in the view we have taken of the case, we pass them by without notice.
The judgment must be reversed for misdirection of the Court, and the case be remanded for a new trial.